IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2013

**DAVID ENRIQUE LEON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2012-CR-371      Robert E. Burch, Judge**

---

**No. M2013-00519-CCA-R3-PC   Filed October 18, 2013**

---

The petitioner, David Enrique Leon, appeals the denial of his petition for post-conviction relief from his first degree felony murder and aggravated robbery convictions, arguing that he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Hilary H. Duke, Dickson, Tennessee (on appeal); and Talmage Woodall, Franklin, Tennessee (at hearing), for the appellant, David Enrique Leon.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Billy H. Miller, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On direct appeal, this court recited the underlying history and facts of the case as follows:

> A Dickson County Circuit Court jury convicted the [petitioner], David Enrique Leon, of first degree felony murder and aggravated robbery, and the trial court sentenced him to consecutive sentences of life and ten years, respectively. . . .

At trial, Ridia Padilla testified that the victim, Rodolfo Padilla, was her father. The victim and his family operated the La Estrella Grocery Store on Highway 46 in Dickson, and an Auto Zone was beside the store. Ridia[1] often worked at the store and was familiar with its layout. She said that a person standing near the thermostat in the store would not have been able to see the cash register at the front because shelves blocked the view. However, a person standing between the shelves would have been able to see the front of the store. About 7:30 p.m. on March 25, 2006, Ridia telephoned her parents at the store and spoke with them. About 10:30 p.m., she learned something had happened to the victim. She went to Vanderbilt Hospital about 11:00 p.m., and the victim was still alive.

Dr. Feng Li, the Assistant Medical Examiner for Metropolitan Nashville and Davidson County, testified that he witnessed the victim's autopsy on March 27, 2006. The victim had a gunshot wound near his left eyebrow and died of a gunshot wound to the head. Powder tattooing around the wound indicated that the muzzle of the gun was two and one-half to three feet away from the victim when it was fired. The bullet, a small to medium caliber, traveled front to back, upward, and slightly left to right. It penetrated the victim's left eyelid, traveled into the brain, and came to rest behind the victim's left eye. On cross-examination, Dr. Lee testified that the muzzle of the gun could have been only inches away from the victim when it was fired.

Madel Padilla testified through an interpreter that she married the victim in 1982 and that he opened the La Estrella Grocery Store in 2003. On March 25, 2006, Madel and the victim were working at the store. About 6:30 p.m., Madel went to a small room in the back of the store to take a nap. The victim woke her at 7:50 p.m., and she went to the front of the store with him. She said that at 8:00 p.m., the victim told her, "[L]et's go it's late." Madel walked to the thermostat toward the back of the store in order to turn off the air conditioner. She said she heard the front door open and heard a voice say in English, "[T]his is a robbery." She could not see the victim because shelves were blocking her view, but she could see the robber's hand holding something. She said that she heard a gunshot "practically at the same time as the words" and that she tried to get out of the store because she was afraid the robber would shoot her too. She went out the back door and re-entered the store through the front door. The victim was lying on the floor behind the

---

[1] Because some of the witnesses share a last name, we will refer to them by their first names for clarity.

sales counter, and blood was coming out of his nose. Madel telephoned 911, and the police and paramedics arrived.

At first, Madel testified that she only saw the robber's arm, not his face. However, she later said she saw "a little bit of him on his face on the side, just a little." The robber took the money the store had collected that day, $6,700 to $6,800, and part of the previous day, $5,000 to $5,500. The victim was disconnected from life support on March 26.

On cross-examination, Madel testified that she heard only one voice and saw only one robber. However, she said she thought more than one person was involved in the robbery because "if he had been the one who fired the gunshot and then gathered together the money I would have seen him upon my return to the store and leaving the store." She acknowledged that she told the police she saw one black male. However, she explained, "Yes, I told them, but I was in panic but I did tell them that it was like a person with a dark skin, dark skin." She said she meant the robber was dark-skinned, not black. She said that when the police asked her if the robber could have been Hispanic, she told them "no or I didn't know." She said the robber had a large arm, was tall, and had a "plump" face. Defense counsel requested that the [petitioner] stand up and asked Madel, "[I]s this a tall, large framed person?" Madel answered, "He might have been larger but if he was as thin as he is now, no." Defense counsel also asked, "So you're saying this is a tall, dark man?" Madel said, "Well, more of a tan skinned-more of my color but, maybe, more darker." She denied telling the police that she was stocking shelves at the time of the robbery.

Deputy Paul Montgomery of the Dickson County Sheriff's Department testified that on the night of March 25, 2006, he was on patrol and was stopped at the traffic light in front of the Auto Zone on Highway 46 in Dickson. He said he could see the La Estrella Grocery Store and heard a "priority one call" for the City of Dickson Police Department. Deputy Montgomery pulled up to the store, looked inside, and saw a distraught woman behind the sales counter. He went inside and saw a man lying behind the counter. He could not understand what the woman was saying but saw that the man had a wound to his upper face or forehead. The store's back door was partially open, and a spent bullet casing was on the floor near the front entrance. Deputy Montgomery also saw money on the counter and on the floor. He said that it would have taken the robber only three to four seconds to have traveled from the front door to the sales counter and back to the front door. On

cross-examination, Deputy Montgomery testified that a person could have fired the gun and exited the store within seconds.

Special Agent Dan Royce of the Tennessee Bureau of Investigation's Firearms and Tool Mark Identification Unit testified that he went to the La Estrella store in the early morning hours of March 26. Upon entering the store, the front sales counter was to the left and seven feet from the front door. A Winchester .25 caliber automatic spent cartridge case, a telephone calling card, and money were on the floor. The location of the cartridge case was consistent with someone's having fired the gun over the counter. Agent Royce tested the cartridge case. However, he was unable to match the cartridge case or the .25 caliber bullet recovered from the victim to any particular gun because no weapon was recovered. He said that a person standing one meter west of the thermostat would have had "a direct line of sight to some of the front door."

Twenty-eight-year-old Alex "Diablo" Gonzales testified through an interpreter that on March 25, 2006, he and the [petitioner] were in an apartment in Nashville. Sergio Hernandez arrived, and the three of them decided to rob the La Estrella Grocery Store. They got into Hernandez's green four-door vehicle and drove to Dickson. Hernandez parked behind the Auto Zone, and Gonzales and the [petitioner] got out and walked to the grocery store. The [petitioner] had a .25 caliber gun, and Gonzales had a .38 caliber gun. The [petitioner] walked into the store first. Gonzales said he entered the store just as the [petitioner] was telling the store owner "that it was a robbery." Gonzales said he saw the [petitioner] lean over the counter and shoot the victim, who was standing behind the counter and was counting money. Gonzales said the gun was one and one-half to two feet away from the victim when the [petitioner] shot the victim. The victim fell to the floor, and Gonzales asked the [petitioner], "[W]hat have you done?" The [petitioner] wanted to run, but Gonzales stopped him. Gonzales went behind the counter and started picking up money. By the time Gonzales finished gathering the money, the [petitioner] was gone. Gonzales said that he only picked up the money that fell out of the victim's hands, $3,300, and that he was in the store for only a few seconds. He returned to Hernandez's truck, where Hernandez and the [petitioner] were waiting. He said that the three of them returned to the apartment in Nashville, that they "split" the money, and that he received $1,100. After the robbery, the [petitioner] shaved his head.

Gonzales testified that his gun was in his pocket when he entered the grocery store and that he never took it out of his pocket because "it wasn't

necessary." He and the [petitioner] entered and exited the store through the front door, and Gonzales did not see anyone other than the victim in the store. When Gonzales returned to Hernandez's vehicle after the robbery, the [petitioner] told him the shooting had been an accident. Gonzales was angry with the [petitioner] for the shooting, took the [petitioner]'s gun, and returned the gun to the [petitioner] when they got back to the apartment in Nashville. Gonzales was charged in federal court for his involvement with the La Estrella robbery and other crimes. He pled guilty but had not been sentenced at the time of the [petitioner]'s trial. He said that as part of his federal plea agreement, he was required to tell the truth.

On cross-examination, Gonzales testified that the [petitioner] was about three feet away from the victim at the time of the shooting. After the shooting, the [petitioner] waited for Gonzales by the front door. Gonzales said that he walked behind the counter to get the money and that the [petitioner] "took off." He said he did not know before the robbery that the victim was going to be shot, and he denied shooting the victim. He also denied giving the .25 caliber gun to the [petitioner] after the robbery and telling the [petitioner] to take the blame for the shooting. He acknowledged that in addition to being charged in this case, he was convicted of robbing and shooting the owner of the Express Market in Madison with "Acapulco" Carlos Fernandez and Sergio Fernandez. He also acknowledged that he [had] been charged with crimes for his involvement in the robberies of the La Espiga Bakery, the Discoteca Mexico, and the Tienda Mexicana. He denied putting his hand up to his head and motioning like a pistol during a recess in the [petitioner]'s trial.

Sergio Reyes Hernandez testified through an interpreter that on March 25, 2006, he, Alex Gonzales, and the [petitioner] were at a friend's home in Nashville. They were using cocaine and marijuana and drinking alcohol. They decided to rob the La Estrella Grocery Store, and Hernandez drove them to Dickson in his 1995 Ford Explorer. He said that he parked beside the Auto Zone and that they "shot some cocaine and stayed there a few minutes." Then the [petitioner] and Gonzales went into the grocery store while Hernandez waited in his vehicle. The [petitioner] and Gonzales returned to the Explorer two or three minutes later, and Hernandez did not remember which man returned first. He said that they got into his vehicle, that he drove them back to Nashville, and that no one said anything about the robbery at that time. At some point, the [petitioner] said he accidentally shot the victim. Gonzales appeared to be mad at the [petitioner] for the shooting. The three men divided the money and used it to buy drugs. The next morning, Hernandez saw the

-5-

[petitioner], and the [petitioner] had cut his hair or his mustache. Hernandez acknowledged that he had been charged in federal court with five crimes related to robberies, kidnappings, and carjackings. He pled guilty to the crimes but had not been sentenced at the time of the [petitioner]'s trial. He said that in exchange for testifying truthfully against the [petitioner], he was hoping to spend less time in prison.

On cross-examination, Hernandez testified that at the time of the robbery, he had known Gonzales since they were small boys in Mexico but had known the [petitioner] for only one month or less. Before the robbery, Hernandez, Gonzales, and the [petitioner] had been at Acapulco Carlos' apartment. He said Carlos was about six feet tall. Hernandez acknowledged that he told the [petitioner] and Gonzales that he thought the La Estrella store would be a good place to rob.

Special Agent Bret Curtis of the Federal Bureau of Investigation testified that he was fluent in Spanish and interviewed the [petitioner] on September 4, 2007, about the [petitioner]'s involvement with the La Estrella robbery. Agent Curtis read Miranda warnings to the [petitioner], and the [petitioner] signed a waiver of rights form. He said that the [petitioner] was very cooperative during the interview and that the [petitioner] apologized for killing the victim. The [petitioner] wrote a statement in Spanish, and Agent Curtis translated it into English. He read the translated statement to the jury. According to the [petitioner]'s statement, Sergio "Chato" Hernandez told the [petitioner] and Alex "Diablo" Gonzales about a store "that would be very easy to rob." The [petitioner], Hernandez, and Gonzales drove to the store in Hernandez's green Ford Explorer. The [petitioner] entered the store, followed by Gonzales, and told the owner it was a robbery. The [petitioner] said in the statement that "'without wanting to and without thought a bullet got away from me and the man fell to the ground.'" The [petitioner] was scared and ran while Gonzales picked up the money. They returned to Hernandez's vehicle, drove back to Nashville, and "split" the money. The [petitioner] said in the statement that they never intended to hurt anyone and that he was sorry for shooting the victim. Agent Curtis said that the interview lasted about one hour, that he did not promise the [petitioner] anything in return for the confession, and that he did not threaten the [petitioner].

On cross-examination, Agent Curtis testified that he thought the [petitioner]'s story was true. He said he did not tell the [petitioner] that the [petitioner] was facing the death penalty. He said that he was nice to the

[petitioner] and that he did not use any tactics to get the [petitioner] to confess. He did not video- or audio-record the [petitioner]'s interview.

Deputy Robert Estes of the Dickson County Sheriff's Department testified that in August 2009, he was working as a corrections deputy in the Dickson County Jail. He said that during a security check on August 18 or 19, he discovered that the security bar on the [petitioner]'s cell window had been "sawed out" and that the window had been cracked and broken. He said that the [petitioner] was the only person in the cell and that he found a hacksaw blade hidden in a crack in one of the cell's walls. On cross-examination, Estes testified that the window in the [petitioner]'s cell was eighteen inches tall and about thirty-six inches long.

Virginia Knox, a translator for the City of Dickson Police Department, testified for the [petitioner] that Madel Padilla gave a statement to a police officer soon after the robbery and that she translated Madel's statement into English. Knox reviewed the statement with Madel, and Madel signed it.

On cross-examination, Knox testified that she and Madel were sitting in a police car when Madel gave the statement and that Madel was crying and shaking. Knox stated that Madel told her the following:

> "[S]he was going back to the refrigerator, she was getting some cold drinks or something like that; and then she heard a noise in the front of the store, and she heard a shot. After the shot then she came around and she hid in the back, she was afraid. And she hid in the back. She went around the counter and she saw a heavy set . . . man with dark skin that appeared to be black or black in color. He was bending over the counter and she said I did not see his face. And so, she went to the back door and ran around the building to see if she could see because she was afraid to go into the front door. She thought she was going to be shot herself, so she was really afraid."

Knox stated that Madel did not tell her Madel heard someone say, "[T]his is a robbery." Knox acknowledged that some people from Mexico had very dark skin. Madel told Knox the robber appeared to be black, but Madel did not know if the robber was black.

[Co-counsel], one of the [petitioner]'s trial attorneys, testified for the

[petitioner] that at the conclusion of Alex Gonzales' testimony, she saw Gonzales gesture to the [petitioner] in what she thought was a "very threatening [manner]." She said that Gonzales "gestured with his hand like this to his head" and that she immediately reported the incident to the prosecutor.

On cross-examination, [co-counsel] acknowledged that Gonzales's hands were shackled together and to his waist. She said that the incident occurred as the jury was exiting the courtroom and that three or four deputies were around Gonzales at the time. She said that Gonzales was sitting down, raised up his hand, put his head down, and made the gesture.

[Counsel], another trial attorney for the [petitioner], testified that he also saw Gonzales "with his hands making a pistol gesture towards his head." He said that Gonzales looked directly at the [petitioner] when Gonzales made the gesture and that Gonzales "glared" at the [petitioner]. As Gonzales left the witness stand and was being led out of the courtroom, he continued to glare at the [petitioner]. [Counsel] said Gonzales walked by the [petitioner], looked at the [petitioner], and "did his finger like a pistol towards him." He said Gonzales also "mouthed" something to the [petitioner].

Steven Rychlik testified on rebuttal for the State that he was the court officer responsible for security during the [petitioner]'s trial. He said he had been present throughout the trial, including while Alex Gonzales was testifying and being escorted out of the courtroom. He said he did not see Gonzales make any gestures toward the [petitioner]. On cross-examination, Rychlik testified that he saw Gonzales look toward the [petitioner] a couple of times but that he did not see Gonzales mouth anything. The jury convicted the [petitioner] of first degree felony murder and aggravated robbery.

State v. David Enrique Leon, No. M2010-00513-CCA-R3-CD, 2011 WL 3630127, at *1-6 (Tenn. Crim. App. Aug. 18, 2011). This court affirmed the petitioner's convictions. Id. at *7.

On June 11, 2012, the petitioner filed a *pro se* petition for post-conviction relief, which was amended twice following the appointment of counsel. The court conducted an evidentiary hearing on November 30, 2012, at which the petitioner, through an interpreter, acknowledged that he was read his Miranda rights before he confessed to his role in the incident. However, he asserted that he was under a lot of pressure to confess because his co-defendants had threatened his family if he told anyone who had killed the victim. He said

that he told counsel that he had been threatened to confess, but counsel told him "that was not going to be a material point - that we needed to move ahead with the case" and did not file a motion to suppress the confession. He stated that counsel did not hire a false confession expert.

The petitioner testified that he told counsel that he wanted to testify at trial, but counsel told him "that it was not necessary." The petitioner recalled that he testified at the sentencing hearing. The petitioner stated that counsel told him that the State intended to present evidence of his attempted escape from jail at trial, but he did not recall whether counsel challenged the admissibility of that evidence.

The petitioner testified that he "received papers" from counsel regarding his appeal, but counsel did not explain the appeal process to him. Counsel did not mention that he would appeal the consecutive sentence imposed by the trial court, and the petitioner did not know if that issue was appealed.

On cross-examination, the petitioner acknowledged that he spoke English fairly well and, at the time he gave his statement, could read it and understand most things. When he gave his confession, he had been in custody of the Department of Correction for a year and a half, since shortly after the crime. The petitioner said that his co-defendants threatened him right "after the incident happened." He elaborated that they threatened to kill his family "[i]f [he] . . . divulge[d] who had killed that person who had died." He said that he had not seen the co-defendants since a week after the incident. He learned when he confessed to the crimes that the co-defendants were in federal custody but admitted that he did not tell anyone about the threats he received. The petitioner denied being the shooter but admitted that he was with the co-defendants. He said that the co-defendants made him shave his mustache afterwards.

The petitioner acknowledged that counsel talked to the jury about false confessions in his opening and closing statements. The petitioner also acknowledged that the decision whether to testify at trial was his and that he decided not to testify. The petitioner agreed that he was in the courtroom when they had a hearing about the admissibility of evidence of his attempted escape from jail and that counsel was successful in suppressing a poem entitled "Almost," that was written at the time of his attempted escape.

The petitioner admitted that counsel talked to him about appealing but did not believe that counsel talked to him about the specific issue of sentencing. He acknowledged that, at the sentencing hearing, although saying that he did not shoot the victim, he testified that he participated in the events that led to the victim's death and received a portion of the proceeds of the robbery. Thus, he essentially confessed to felony murder.

-9-

Counsel testified that he reviewed the petitioner's confession and talked to the officers about the circumstances surrounding the confession, and he noted that the petitioner did not mention to the officers that he was in fear for himself or his family. The petitioner told him that he was afraid of one or both of the co-defendants but did not "mention fear for his family or that he made the confession based on that." Counsel considered whether to pursue a motion to suppress "but based on the fact that [the petitioner] initially told [him] he was the shooter and . . . later advised that he was not shooter; but that he was present and only took part in the robbery," counsel decided that it was not "prudent to pursue a motion to suppress, put [the petitioner] on to testify and have him confess to felony murder on the witness stand." Counsel elaborated:

> I made a tactical decision based on the investigation of the confession, based on the fact that the agents advised that he was able to show them where he was standing when both the bullet got away from him, when the [victim] was shot, the detail that he gave, the circumstances under which . . . it was given, it was not a situation where he was taken into custody and held for hours and hours and hours. He pretty much just broke down crying and told them that he had done it. And based on that I made the decision[] . . . not to pursue a motion to suppress. I didn't think that it would be a valid basis to try to get it suppressed.

Counsel testified that the petitioner testified at the sentencing hearing, over his objection, and essentially ended up confessing to felony murder on the stand. He said that the petitioner "just could not understand why he should be held guilty of a murder if he was not the one, as he maintained later, that pulled the trigger."

Counsel testified that, prior to trial, he requested from the State any surveillance videos from the store or the surrounding businesses and was advised that "there were no such videos[.]" He recalled that the store did have a surveillance system, but "it was not on or not working at the time." Counsel said that, although he did not have an independent recollection of Special Agent Dan Royce's testimony, he would not dispute that Agent Royce testified that there was no footage on the surveillance system.

Counsel testified that he investigated the issue of the petitioner's attempted escape from jail and advised the petitioner of the implications of the proof and what a flight or attempted flight jury instruction would be. Counsel and the prosecution agreed to have a jury-out hearing regarding the petitioner's attempted escape and what evidence the State could present, and they did have "a full blown jury-out hearing." Counsel was successful in suppressing a poem written by the petitioner. He said that filing a motion in limine would have accomplished nothing more than what was accomplished in the jury-out hearing.

-10-

Counsel testified that he made a strategic decision not to appeal the petitioner's consecutive sentences because the petitioner had testified at the sentencing hearing and "given as good a confession to felony murder as you can get." Counsel "didn't want the Appella[te] Judge reading a full blown confession to felony murder in court at his sentencing hearing and that even being in their mind as they consider[ed] the strength of the evidence against [the petitioner] at trial." He said that, even though relief "would not have been likely," he would have raised the issue on appeal and argued that the trial court "did not apply the appropriate factors in regard to consecutive sentencing" had the petitioner not testified at the sentencing hearing.

Counsel acknowledged that he did not pursue hiring a false confession expert but noted that he discussed the issue throughout trial, from voir dire to closing argument. Counsel felt that he raised doubt that the petitioner was the shooter through his cross-examination of the victim's wife and her physical description of the shooter. In any event, counsel said that a false confession expert would have only been able to say whether the petitioner was lying with regard to whether he was the shooter, which would not negate the petitioner's guilt for felony murder.

After the hearing, the post-conviction court entered a written order concluding that none of the petitioner's allegations had merit.

## ANALYSIS

The petitioner raises five allegations of ineffective assistance of counsel. He asserts that counsel was ineffective for failing to file a motion to suppress his confession; failing to investigate and/or obtain surveillance video from the grocery store where the offenses occurred; failing to file a motion in limine to exclude evidence of the petitioner's attempted escape from jail; failing to procure the services of a false confession expert; and failing to argue on appeal that the trial court's imposition of consecutive sentences was in error.

### I. Ineffective Assistance of Counsel

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978

-11-

S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. Motion to Suppress Confession

The petitioner argues that counsel was ineffective for failing to file a motion to suppress his confession.

Counsel testified that he investigated the circumstances surrounding the confession, and he noted that the petitioner did not mention to the officers that he was in fear for himself or his family, even after learning that the co-defendants were in federal custody. The petitioner told counsel that he was afraid of one or both of the co-defendants but did not "mention fear for his family or that he made the confession based on that." We cannot conclude that counsel performed deficiently because the petitioner gave no reason for counsel to file a motion to suppress, and the proof at the evidentiary hearing did not justify suppression.

### B. Surveillance Video

The petitioner argues that counsel was ineffective for failing to investigate and/or obtain surveillance video from the grocery store where the offenses occurred.

Although counsel did not conduct an independent investigation into whether surveillance video from the store existed, he requested such information from the State and was informed that there was none. Counsel recalled that the store's surveillance system was either not on or not working at the time. We discern no deficiency in counsel's performance. Moreover, at the evidentiary hearing, the petitioner offered no proof that there was a surveillance video available and that the contents of the hypothetical video would have raised a reasonable probability that the result of the proceeding would have been different. As such, the petitioner has failed to show that he was prejudiced by counsel's "failing to investigate and[/]or obtain the surveillance video from La Estrella Grocery Store."

### C. Attempted Escape from Jail

The petitioner argues that counsel was ineffective for failing to file a motion in limine to exclude evidence of his attempted escape from jail.

As to this issue, counsel testified that he and the prosecution agreed to have a jury-out hearing during the trial regarding the petitioner's attempted escape and what evidence the State could present. At that hearing, counsel was successful in suppressing a poem entitled "Almost" written by the petitioner. Had counsel filed a motion in limine to have the same hearing pretrial, the result would not have been any different. The petitioner argues that counsel "would have been more adequately prepared to argue the prejudicial versus probative effect"; however, he offered no proof as to how counsel would have been more adequately prepared. We cannot conclude that counsel was deficient for addressing this issue in a jury-

out hearing rather than a motion in limine, or that the petitioner suffered any prejudice as a result.

### D. False Confession Expert

The petitioner argues that counsel was ineffective for failing to procure the services of a false confession expert.

At the evidentiary hearing, counsel testified that even though he did not pursue hiring a false confession expert, he discussed the issue throughout trial from voir dire to closing argument. Counsel raised doubt that the petitioner was the shooter through his cross-examination of the victim's wife and her physical description of the shooter. We cannot conclude that counsel performed deficiently. In any event, a false confession expert would have only been able to say whether the petitioner was lying with regard to whether he was the shooter, which would not have negated the petitioner's guilt for felony murder. Therefore, the petitioner suffered no prejudice.

### E. Consecutive Sentences

The petitioner argues that counsel was ineffective for failing to argue on appeal that the trial court's imposition of consecutive sentences was in error.

At the evidentiary hearing, counsel testified that he made a strategic decision not to appeal the petitioner's consecutive sentences because the petitioner had testified at the sentencing hearing and "given as good a confession to felony murder as you can get." Counsel "didn't want the Appella[te] Judge reading a full blown confession to felony murder in court at his sentencing hearing and that even being in their mind as they consider[ed] the strength of the evidence against [the petitioner] at trial." Had the petitioner not insisted on testifying at the sentencing hearing against his advice, counsel said that he would have argued on appeal that the trial court "did not apply the appropriate factors in regard to consecutive sentencing," even though he thought relief would be unlikely. As found by the post-conviction court, "Since [the] [p]etitioner testified at the sentencing hearing and essentially confessed to felony murder, trial counsel was of the opinion that this would damage his chances on appeal of obtaining a reversal of [the] [p]etitioner's adjudication of guilt." However, we need not decide whether counsel performed deficiently because the petitioner entirely failed to prove that he was prejudiced in that he provided no argument to support his contention that ordering that he "serve the two convictions consecutively did not satisfy the requirements laid out in Tenn. Code Ann. § 40-35-115."

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____

ALAN E. GLENN, JUDGE